JOHNS, APPELLEE, *v.* FORD MOTOR CREDIT COMPANY, APPELLANT.

WACKERLY, APPELLEE, *v.* FORD MOTOR CREDIT COMPANY, APPELLANT.

[Cite as Johns *v.* Ford Motor Credit Co. (1990), 49 Ohio St. 3d 84.]

(Nos. 88-2091 and 89-165—Submitted September 20, 1989—
Decided February 28, 1990.)

Donald R. Little, for appellees.

Buckingham, Doolittle & Burroughs, Frederick M. Lombardi and Patrick J. Keating, for appellant.

MOYER, C.J. This case presents two issues for our consideration.

The first issue is whether a car dealer violates the Retail Installment Sales Act, R.C. 1317.07, by selling a new car at a price in excess of the sticker or manufacturer's suggested list price.

R.C. 1317.07 provides in pertinent part:

"No retail installment contract authorized by section 1317.03 of the Revised Code which is executed in connection with any retail installment sale shall evidence any indebtedness in excess of the time balance fixed in the written instrument in compliance with section 1317.04 of the Revised Code * * *."

R.C. 1317.04 provides in pertinent part:

"The written instrument evidencing a retail installment sale * * * shall recite the following:

"(A) The cash price of the specific goods;

"(B) The amount in cash of the retail buyer's down payment, if any, whether made in money or goods or partly in money or partly in goods;

"(C) The unpaid balance of the cash price payable by the retail buyer to the retail seller which is the difference between divisions (A) and (B)."

Further, R.C. 1317.08 provides:

"If charges greater in amount than those provided for in * * * [R.C. 1317.04] are received by the retail seller, his agent, assignee, or successor in interest, the retail buyer, his assignee, or successor in interest may recover the total amount paid to the retail seller, his agent, assignee, or successor in interest, from the retail seller or the holder of the retail installment contract."

The court of appeals held that the cash price as required by R.C. 1317.04(A) is "determined not by the final bottom line price agreed to by these parties, but is rather the starting point—the price, sticker or otherwise, before trade-in allowances, for which any purchaser who had cash in hand could purchase the * * * [automobiles]."

R.C. 1317.01(K) defines "cash price" as "the price measured in dollars, agreed upon in *good faith by the parties* as the price at which the *specific goods* which are the subject matter of any retail installment sale would be sold if such sale were a sale for cash to be paid upon delivery *instead* of a *retail installment sale.* * * *" (Emphasis added.)

R.C. 1317.01(K) requires that the parties arrive at the cash price for the specified goods by good faith negotiation, but does not require that such cash price include charges attendant to retail installment sales — finance and service charges. See R.C. 1317.01(N)

and (O).[1] The statute does not require that "cash price" be a fixed, predetermined amount applicable to all buyers. The test is not what is the seller's price for the goods for all buyers or even the retail price suggested by the manufacturer, but whether the price to a particular buyer was agreed upon in a good faith negotiation. Such price as required by the statute should not include finance and service charges. See Consumer Credit: The Ohio Retail Installment Sales Act and its Abuses (1969), 20 Case W. Res. L. Rev. 621, 632, at fn. 44.

"* * * Chapter 1317 was enacted by the General Assembly in order to correct certain abuses existing in the field of dealer participation in the financing of sales made on the installment plan, * * * the abuses directly responsible for the legislation centered in the area of sales of automobiles, both new and used. Such unregulated dealer participation resulted in activities amounting to fraud on the general public in the nature of hidden and disguised profits included not in the sale price of the automobile but in the cost of the finance plan * * *." *Teegardin* v. *Foley* (1957), 166 Ohio St. 449, 453, 2 O.O. 2d 462, 464, 143 N.E. 2d 824, 827. R.C. 1317.07 was not intended to legislatively fix the price for goods, see *Teegardin, supra,* at 458, 2 O.O. 2d at 467, 143 N.E. 2d at 830, but has as one of its objectives, meaningful disclosure to the consumer of credit terms, so as to avoid uninformed use of financing plans. See *Teegardin, supra,*

at 462, 2 O.O. 2d at 469, 143 N.E. 2d at 832. The statute requires that at the time of undertaking the obligation, the buyer be informed in writing of the actual price of the goods, and of any trade-ins affecting such price. See Annotation, Construction and Effect of Disclosure Statutes Requiring One Extending or Making Loans to Give Statement Showing Terms as to Amounts Involved and Charges Made (1967), 14 A.L.R. 3d 330, 334, Section 2[a].

Appellees do not claim that they had no knowledge of the amounts Wally Armour charged them for the automobiles or that the amounts charged were not agreed upon in good faith. The facts show that the parties determined the amounts by negotiation and that the purchase prices and financing arrangements were disclosed at the time appellees entered into the purchase agreements. It is thus clear that the informational purpose of R.C. 1317.04 was subserved.

Having determined that the cash price of a specified good in a retail installment sale is not a predetermined fixed amount but an amount agreed upon in good faith by the parties, we conclude that the cash price for a new car is not necessarily fixed at the manufacturer's suggested retail price.

We next consider whether a retail seller may sell a new automobile at a price in excess of the manufacturer's suggested retail price by including the negative equity of a trade-in in such price. Appellees, relying on *In re Sloan*

---

[1] R.C. 1317.01(N) and (O) state:

"(N) 'Finance charge' means the amount which the retail buyer pays or contracts to pay the retail seller for the privilege of paying the principal balance in installments over a period of time. Any advancement in the cash price ordinarily charged by the retail seller is a finance charge when a retail installment sale is made.

"(O) 'Service charge' means the amount which the retail buyer pays or contracts to pay the retail seller for the privilege of paying the principal balance in installments over a period of time in addition to the finance charge for the same privilege."

(N.D. Ohio 1968), 285 F. Supp. 1, contend that Wally Armour created an indebtedness greater than is permissible under R.C. 1317.07 by including the negative equity of their trade-ins in the cash price of the automobiles.

It is a matter of common knowledge that most new car sales are accompanied by trade-ins. Inclusion of the negative equity of a trade-in is nothing more than a convenient means of accommodating a buyer who is offering a depreciated trade-in. It is, in other words, a practical method of facilitating the release of an outstanding security interest in order that the trade-in allowance can be made as contemplated in R.C. 1317.04. Note, *In re Sloan:* A New Look at the Ohio Retail Installment Sales Act (1969), 30 Ohio St. L. J. 144, 145-146. Parallel legislation in several other states suggests that a down payment when made in goods implies the net agreed value of the property traded in. When such net agreed value is a negative amount because the amount owed on the trade-in is larger than the market value of the trade-in, the parties may properly include such amount as part of the cash price if agreed to in good faith. *Id.* at 146; *Stasher* v. *Harger-Holdeman* (1962), 58 Cal. 2d 23, 31, 22 Cal. Rptr. 657, 661, 372 P. 2d 649, 653.

Here, appellees were able to purchase the specific automobiles they desired because their trade-ins were afforded more value on paper than they actually had. They received the benefits of the negotiations and the agreements.

For the foregoing reasons, we reject the holding in *In re Sloan, supra,* and hold that the inclusion of the negative equity of a trade-in in the cash price of a specified good does not violate R.C. 1317.07 if the inclusion of the negative equity is agreed to in good faith by the parties.

Accordingly, the judgments of the court of appeals are reversed.

*Judgments reversed.*

SWEENEY, HOLMES, DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.